UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

------------------------------------------------------

MARY BETH AQUILA,

               plaintiff,

     v.

ALLEN'S PODIATRY CLINIC, L.L.C.
           Defendant.

------------------------------------------------------

**CASE NO. 18-cv-_____**

**JUDGE _____**

**MAGISTRATE JUDGE _____**

**JURY TRIAL DEMANDED ON SPECIFIC ISSUES**

## <u>COMPLAINT</u>

**BIZER & DEREUS**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Jennifer M. Coco (LA # 34492)
jcoco@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

## PRELIMINARY STATEMENT

1.       Mary Beth Aquila is a deaf individual who communicates primarily in American Sign Language ("ASL"), which is her primary language. Ms. Aquila is not fully proficient in English, and has difficulty reading complex terminology and documents in written English.  In April 2018, Ms. Aquila's primary care physician referred her to the Defendant for specialized podiatry services.  This action concerns the Defendant's refusal to provide medical care to Ms. Aquila because she is Deaf and requested an interpreter at her appointment.

2.       As a Deaf individual who communicates primarily in ASL, it is vital that Ms. Aquila have access to a qualified in-person interpreter or another auxiliary aid at her medical appointments, in order to fully communicate with the physician and their staff.

3.       Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for direct doctor-patient communication through a qualified sign language interpreter. Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips.

4.       Moreover, ASL (Ms. Aquila's primary language) and English are two completely distinct languages that are mutually unintelligible.  They are as different from one another as English is from Russian, for example.  Thus, expecting a Deaf individual like Ms. Aquila to lip-read English speakers is also not an appropriate alternative to a qualified in-person interpreter.

5.       Nor is it appropriate to refuse an interpreter or other auxiliary aid and rely on passing written notes instead.  Many deaf individuals, including Ms. Aquila, do not have full knowledge of written English.  Indeed, the median reading comprehension level in English of deaf high school graduates is fourth grade.  This is because English is generally a second

language (after ASL or another form of sign language) for individuals who are born deaf or become deaf before acquiring language.  In addition, many deaf people acquire English as their second language later in life, and well past the critical developmental period of language acquisition.  Further, while a hearing person could easily ask an employee or staff member to explain an unknown medical word or phrase, a Deaf person is unable to ask for assistance in understanding unknown English words without the aid of a sign language interpreter or other auxiliary aid.

6.     Video Remote Interpreting (VRI) is a videotelecommunication service that uses devices such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter.

7.     Ms. Aquila brings this lawsuit seeking injunctive and declaratory relief and attorneys' fees and costs to redress the Defendant's unlawful discrimination and retaliation on the basis of disability in violation of Title III of the Americans With Disability Act, 42 U.S.C. § 12181 ("ADA"); Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116.  Ms. Aquila also seeks compensatory and nominal damages pursuant to the Rehabilitation Act and Section 1557.[1]

8.     With regards to Ms. Aquila's request for nominal damages, it is Ms. Aquila's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in her favor against the Defendant, regardless of the amount, would deter the Defendant from discriminating against deaf individuals in the future.

---

[1] Ms. Aquila recognizes that money-damages are not available under Title III of the ADA.

## THE PARTIES

9.     Plaintiff Mary Beth Aquila (hereinafter "Ms. Aquila") brings this action and is an individual residing in Slidell, Louisiana. Ms. Aquila communicates primarily in American Sign Language and is substantially limited in the major life activities of hearing and speaking and is a qualified person with a disability within the meaning of the ADA, RA, and Section 1557.

10.     Defendant ALLEN'S PODIATRY CLINIC, L.L.C. is a limited liability company organized in Louisiana with the domicile of 16026 Doctors Boulevard, Hammond, LA 70403. The Defendant owns, leases, and/or operates Allen's Podiatry Clinic, which is located at the same address. The Defendant is operating a place of public accommodation under federal antidiscrimination laws and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements, thus making the Defendant subject to the requirements of the ADA, Section 1557 and the RA.

## JURISDICTION & VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Ms. Aquila's claims arising under federal law.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendant committed discriminatory acts within the jurisdiction of this District and a substantial part of the events that give rise to the claims occurred in this District.

## STATEMENT OF FACTS

13.     Ms. Aquila is a deaf individual who communicates primarily through ASL.  She can read lips to facilitate basic dialogue concerning simple matters, and will attempt to reply to simple dialogue in English with her voice when she has no other option to communicate in ASL.

However, as a deaf individual, she has difficulty modulating the volume and tone of her voice. Any communication involving complex topics, especially medical, necessitates the use of ASL.

14.     Specifically, Ms. Aquila requires auxiliary aids and services, like an in-person sign language interpreter, to communicate in an equivalent manner to non-disabled, hearing persons, in a medical setting.  Ms. Aquila also requires a sign language interpreter in order to understand her doctors and nurses and to assist her with asking questions in ASL about the meaning of complex documents that are written in English and documents that use advanced terminology.

15.     Ms. Aquila has knowledge of some written and spoken English.  However, she is not fully proficient in comprehending written English and cannot participate in long discussions in English.  Ms. Aquila's entire formal education occurred in ASL in environments designed for Deaf individuals.  Specifically, she graduated from the Louisiana School for the Deaf, and completed college at Gallaudet University in Washington, D.C., the world's only university designed to be barrier-free for Deaf and hard of hearing students, and Southeastern Louisiana University, with sign language interpretation accommodations.

16.     Ms. Aquila is a leader within her local Deaf community at home, serving as the vice president of the North Shore Louisiana Deaf Coalition, Inc.  She has dedicated many years to advocating for herself and other Deaf individuals on their right to ASL interpreters.

17.     Ms. Aquila's primary care physician, Dr. Charles DuCombs, identified that Ms. Aquila required specialized podiatry care for treatment of an ingrown nail and fungus on the big toe of her right foot.  In April 2018, Dr. DuCombs provided her with a referral to the Defendant, podiatrist Dr. John Allen.

18.     In mid-April 2018, Ms. Aquila contacted Dr. Allen's office to request an appointment, by calling the office through a video relay service.  At this time she requested an ASL interpreter to be present at the appointment she wished to schedule.  The receptionist did not schedule Ms. Aquila for an appointment; on information and belief, the failure to schedule an appointment at this time was due to Ms. Aquila's request for an interpreter, and the receptionist's refusal to commit to the provision of an interpreter.  The receptionist indicated that the provision of an interpreter required a conversation with Dr. Allen.

19.     To assist Dr. Allen's office with procuring an ASL interpreter for her appointments, Ms. Aquila put Dr. Allen's office in contact with at least one ASL interpreter agency in the area, the Communications Consulting Group, LLC ("CC Group").

20.     Upon information and belief, between April 20 and April 26, 2018, a representative from the CC Group communicated several times with Dr. Allen's office, by telephone, email, and in person.  Upon information and belief, the representative from the CC Group provided Dr. Allen's office with general information about ASL interpreters, and emailed a proposed service agreement for providing ASL interpreters for Deaf patients.

21.     Upon information and belief, Dr. Allen's office did not retain the CC Group for provision of ASL interpretation to patients.

22.     Upon information and belief, Dr. Allen's office did not take any steps necessary to procure any ASL interpreter for an appointment with Ms. Aquila.

23.     Ms. Aquila called Dr. Allen's office several times to follow up on her request for an appointment.  On her third phone call to the office, the receptionist hung up on her.  Upon information and belief, Dr. Allen's office never returned Ms. Aquila's phone calls.

24.     On May 2, 2018, Ms. Aquila visited Dr. Allen's office in-person to follow up on her need for an appointment, as well as the issue of whether a sign language interpreter would be provided by the office.  Ms. Aquila went in-person because Dr. Allen's office had not returned her prior phone calls, and because she was in a near-by building seeing another physician.  Ms. Aquila attempted to use written notes, lip-reading, and responding with her voice to communicate her request to make an appointment and verify that Dr. Allen's office would provide an interpreter.  On information and belief, the receptionist informed Ms. Aquila that Dr. Allen's office would not provide an interpreter.

25.     Ms. Aquila became frustrated at her inability to make an appointment with necessary accommodations for her disability.  Ms. Aquila's frustration was in part due to her struggle to communicate in English, and not in ASL.  As stated above, when resorting to using her voice to communicate with hearing individuals, Ms. Aquila has difficulty modulating the volume and tone of her voice due to her disability.

26.     Upon Ms. Aquila's display of frustration, the receptionist began filming Ms. Aquila from behind the desk and threatened to call the police.  This caused Ms. Aquila significant humiliation and further exacerbated Ms. Aquila's frustration and anger.  Ms. Aquila became more insistent in asserting her rights as a Deaf person to be seen by Dr. Allen with an ASL interpreter present.  Nevertheless, Ms. Aquila complied with the receptionist's request and left Dr. Allen's office.

27.     To date, Dr. Allen's office has not taken any steps to rectify its discrimination against Ms. Aquila or schedule her for an appointment.

28.     The Defendant's denial of medical care with any auxiliary aids to Ms. Aquila constituted discrimination on the basis of her disability.  The Defendant's threats to Ms. Aquila

in response to her assertions of her civil rights as an individual with a disability constituted further discrimination and retaliation.  This discrimination caused Ms. Aquila to experience fear, anxiety, frustration, indignity, emotional distress, mental anguish, embarrassment, and humiliation, as well as a violation of her civil rights.

29.    The Defendant, through its staff, employees, nurses, and/or doctors, knew or should have known of its obligations under the ADA and Section 504 of the Rehabilitation Act to provide accommodations to individuals with disabilities, including individuals who are deaf, and to develop policies to promote compliance with these statutes.

30.    The Defendant, through its staff, employees, nurses, and/or doctors, knew or should have known that the actions and/or inactions of its staff created an unreasonable risk of causing Ms. Aquila greater levels of fear, anxiety, frustration, indignity, emotional distress, mental anguish, embarrassment, and/or humiliation than a hearing person would be expected to experience.

31.    The harm sustained by Ms. Aquila herein is the expected and foreseeable consequence of the Defendant's failure to comply with the requirements and mandates of federal civil rights law. The statute and accompanying regulations exist to ensure that individuals with disabilities who have communication limitations will have full use of places of public accommodations. When the Defendant failed to adhere to its obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by Ms. Aquila in this lawsuit.

32.    The Defendant, through its staff, employees, nurses, and/or doctors, refused to make an appointment for Ms. Aquila on account of her disability.

33.     The Defendant, through its staff, employees, nurses, and/or doctors, excluded Ms. Aquila from the medical services offered to the general public on account of her disability.

34.     The Defendant, through its staff, employees, nurses, and/or doctors, refused to provide any accommodations for Ms. Aquila's disability.

35.     The Defendant, through its staff, employees, nurses, and/or doctors, threatened Ms. Aquila and retaliated against her, solely on the basis of her efforts to assert her civil rights.

36.     Despite the Defendant's knowledge of its obligation to accommodate persons with disabilities—including individuals that are deaf—the Defendant did not take adequate steps to ensure that it communicated with Ms. Aquila in a manner equivalent to hearing persons.

37.     As a result of the Defendant's refusal to provide accommodations to Ms. Aquila, she was denied access to medical services on the basis of disability.

38.     The Defendant discriminated against Ms. Aquila with deliberate indifference to her disability and related communication needs.

39.     Based on the facts alleged above, the Defendant intentionally discriminated against Ms. Aquila.

40.     Further, the Defendant was purposeful in its choices, which is sufficient to constitute intentional discrimination under the RA and ACA.

41.     In the alternative, the Defendant is liable under the RA and Section 1557 of the ACA pursuant to the case of *Kelly v. Boeing Petroleum Servs., Inc.*, in which the Fifth Circuit held that the Supreme Court case of *Alexander* expressly rejected the notion that a plaintiff is required to show intentional discrimination to establish a prima facie case of disparate impact discrimination under the RA.  *See* 61 F.3d 350, 365 (5th Cir. 1995).

42.     The harm sustained by Ms. Aquila herein is the expected and foreseeable

consequence of the Defendant's failure to comply with the requirements and mandates of the RA and ACA. These statutes and accompanying regulations exist to ensure that those with communication limitations will have equal access to places of public accommodations. When the Defendant failed to adhere to its obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by Ms. Aquila in this lawsuit.

43.     By and through the Defendant's failure to make its healthcare services meaningfully accessible to individuals who are deaf, the Defendant has committed disparate impact discrimination sufficient to state a claim for damages under the RA and ACA.

44.     Ms. Aquila is presently deterred from receiving the Defendant's healthcare services due to their refusal to accommodate her disability and their outright hostility towards her assertion of her rights.  The Defendant's discrimination is likely to continue absent a court order. She desires to utilize the Defendant's services in the near future, due to her primary care physician referring her there for necessary medical care, her need for podiatry medical services that are within her insurance network, the proximity of the facility to her home, and her ongoing need for the specific medical care provided by the Defendant.  Ms. Aquila's medical problems with her foot persist and she would like to receive medical care from Dr. Allen as soon as possible.  Thus, Ms. Aquila clearly evidences an intent to return to the Defendant for ongoing medical care, but needs the Defendant to provide the necessary accommodations for her disabilities along with the provision of medical care.

45.     Due to the ongoing discrimination she has encountered, Ms. Aquila reasonably anticipates that she will encounter discrimination again in the near future when she next returns to Defendant's facility for medical care, without taking legal action to protect her rights.

## CLAIM I: VIOLATIONS OF TITLE III OF THE
## AMERICANS WITH DISABILITIES ACT

46.     Ms. Aquila repeats and realleges paragraphs 1-45 in support of this claim.

47.     At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, et seq. has been in full force and effect and has applied to the Defendant's conduct.

48.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, have been in full force and effect and have applied to the Defendant's conduct.

49.     At all times relevant to this action, Ms. Aquila has been substantially limited in the major life activities of hearing and communicating, and is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

50.     The Defendant owns and operates a place of public accommodation within the meaning of 42 U.S.C. § 12181(7)(F).

51.     Title III of the ADA provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

52.     Title III of the ADA further provides that "[i]t shall be discriminatory to subject an individual … on the basis of disability … to a denial of the opportunity of the individual … to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).  Moreover, Title III of the ADA similarly provides that "[i]t shall be discriminatory to afford an individual … on the basis of a disability … with the opportunity to participate in or benefit from a good, service, privilege,

advantage, or accommodation that is not equal to that afforded to other individuals." *Id.* at § 12182(b)(1)(A)(ii).

53.    Federal regulations implementing Title III of the ADA provide that a public entity "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

54.    Federal regulations implementing Title III of the ADA further provide that a public entity "shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 28 C.F.R. § 36.303(a).

55.    Similarly, these federal regulations state that a public entity "shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities…" 28 C.F.R. § 36.302.

56.    Additionally, the ADA prohibits retaliation against "any individual because such individual has opposed any act or practice made unlawful [under the statute]." 42 U.S.C. § 12203(a).  Similarly, the ADA states that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of … any right granted or protected by this [statute]." *Id.* at § 12203(b).

57.    Based on the above allegations, the Defendant discriminated against Ms. Aquila on the basis of disability, in violation of Title III of the ADA and its implementing regulations.

58.    The Defendant further retaliated against, intimidated, and threatened Ms. Aquila because she exercised her rights under the ADA.

59.    As set forth above, absent injunctive relief there is a clear risk that the

Defendant's actions will recur and cause Ms. Aquila additional injury.

60.     Ms. Aquila is therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1).

### CLAIM II: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

61.     Ms. Aquila repeats and realleges paragraphs 1-60 in support of this claim.

62.     At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to the Defendant's conduct.

63.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to the Defendant's conduct.

64.     At all times relevant to this action, Ms. Aquila had substantial limitations to the major life activities of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

65.     At all times relevant to this action, the Defendant offered a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

66.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

67.     The Defendant discriminated against Ms. Aquila, solely on the basis of disability, by denying her equal access to the services, programs, and benefits the Defendant offers to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure communication equivalent to that provided to hearing persons, in violation of 29 U.S.C. § 794.

68.     The Defendant also discriminated against Ms. Aquila, solely on the basis of

disability, by denying her reasonable accommodation requests, in violation of 29 U.S.C. § 794.

69. Ms. Aquila is therefore entitled to seek and recover compensatory and nominal damages for the injuries and loss she sustained as a result of the Defendant's discriminatory conduct and deliberate indifference alleged herein, pursuant to 29 U.S.C. § 794(a).

70. Ms. Aquila is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## CLAIM III: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

71. Ms. Aquila repeats and reiterates every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

72. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116 was in full force and effect, and applied to Defendants' conduct.

73. At all times relevant to this action, Section 1557, 42 USC § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

74. At all times relevant to this action, Ms. Aquila had substantial limitations to the major life activities of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and of Section 1557, 42 USC § 18116.

75. At all times relevant to this action, Ms. Aquila's primary language for communication was American Sign Language, and not English; Ms. Aquila has limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

76. At all times relevant to this action, the Defendant received federal financial

assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, the Defendant is operating health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

77.     Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

78.     The Defendant discriminated against Ms. Aquila solely on the basis of disability, by excluding her from the services, programs, and benefits that the Defendant offered to other individuals in violation of Section 1157, 42 U.S.C. § 18116.

79.     The Defendant discriminated against Ms. Aquila solely on the basis of disability, by denying her equal access to the services, programs, and benefits that the Defendant offered to other individuals and by refusing to provide auxiliary aids and services necessary to ensure access to its services in violation of Section 1157, 42 U.S.C. § 18116.

80.     The Defendant discriminated against Ms. Aquila by failing to ensure equivalent communication to that provided hearing persons, through its refusal to provide qualified sign language interpreters on-site and/or through VRI machines.

81.     The Defendant discriminated against Ms. Aquila by denying her requests for reasonable accommodations.

82.     Ms. Aquila is therefore entitled to seek and recover compensatory and nominal damages for the injuries and loss she sustained as a result of the Defendant's discriminatory conduct as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

83.     Ms. Aquila is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a), the Rehabilitation Act, 29 U.S.C. § 794(a).

## PRAYER FOR RELIEF

**WHEREFORE,** Ms. Aquila respectfully prays that this Court grant the following relief against the Defendant:

A.     Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's policies, procedures, and practices subjected Ms. Aquila to unlawful discrimination in violation of the RA and Section 1557;

B.     Issue an injunction ordering the Defendant:

      i.     to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Ms. Aquila or other deaf individuals by failing to provide accommodations in the form of a sign language interpreter and other appropriate auxiliary aids and services;

      ii.     to develop, implement, promulgate, and comply with a policy requiring that when a deaf individual requests an in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by the Defendant;

      iii.     to develop, implement, promulgate, and comply with a policy to ensure that the Defendants will notify individuals who are deaf or hard of hearing of their right to accommodations in the form of  a sign language interpreter and other appropriate auxiliary aids and services. This notification will include posting explicit and clearly worded notices that the Defendant will provide sign

language interpreters, videophones, and other communication services to ensure equal access for deaf persons;

iv. to develop, implement, promulgate, and comply with a policy to ensure that deaf individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the VRI is not appropriate in all medical situations;

v. to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vi. to train all its employees, staff, and other agents on a regular basis about the rights of individuals who are deaf under the ADA, RA, and ACA; and

vii. to train all its employees, staff, and other agents on a regular basis about how to obtain interpreters when reasonably requested by deaf individuals.

C.    Award to Ms. Aquila:

i. Compensatory and nominal damages pursuant to the RA and ACA;

ii. Reasonable costs and attorneys' fees pursuant to the RA and ACA;

iii. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

iv. Any and all other relief that this Court finds necessary and appropriate.

## DEMAND FOR JURY TRIAL

Ms. Aquila demands trial by jury on the issues of (1) the injuries she suffered as a result of the Defendant's discriminatory conduct; and (2) the quantum of damages that should be awarded.

Dated: May 24, 2018

Respectfully Submitted,

**BIZER & DEREUS**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Jennifer M. Coco (LA # 34492)
jcoco@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Jennifer M. Coco
        Jennifer M. Coco